# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VAN DINH LE, deceased, THROUGH HIS SUCCESSOR-IN-INTEREST, AMY THU BICH LE; and AMY THU BICH LE, individually; KEVIN LE; VIVIAN LE,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF ESCONDIDO, a public entity; CITY OF ESCONDIDO POLICE CHIEF JIM MAHER, in his individual and official capacities; POLICE OFFICER MATTHEW NELSON, individually; and DOES 1 through 10, jointly and severally,<br><br>Defendants. | CASE NO. 11-CV-2241 BEN (NLS)<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>[ECF No. 22] |

This case arises from the fatal shooting of Van Dinh Le by Escondido Police Officer Matthew Nelson. Le's wife and adult children (collectively "Plaintiffs") assert federal and state claims against Nelson, the City of Escondido, and Escondido's chief of police. Presently before the Court is Defendants' motion for summary judgment. For the reasons stated below, the motion is **GRANTED**.

//

//

# BACKGROUND[1]

## I.  Factual background

On March 3, 2011, Van Dinh Le, 51, was shot and killed by Escondido Police Officer Matthew Nelson. Le was an unemployed electrical engineer with a history of severe depression. In the days leading up to his death, Le's wife, Amy,[2] grew concerned her husband might hurt himself. At one point, she removed the knives from her home after seeing Le test the edge of a knife on his arm. Le's psychiatrist advised her to take Le to a hospital, but Amy opted to watch over Le herself.

On the morning of the incident, Le was despondent. He told his wife he was desperate. Worried, Amy locked herself in the bedroom to call 911 for help. Meanwhile, Le took a pair of scissors from the kitchen into a second floor bathroom. Amy emerged when she heard a gurgling sound. Upon seeing Le holding his neck, Amy fled to the neighbors for help. Le had cut his neck, severing his jugular vein.

Nelson and Officer Damien Torres separately responded to a report of a suicidal individual. The officers were advised that a man had cut his throat and barricaded himself in a room at the house. En route, Torres activated a video camera affixed to his vest. (Defs.' NOL, Exhs. 7 and 8 (audio/video of incident and transcript.)) Nelson, a new father working on less than five hours of sleep, asked over the radio if anyone had a protective shield. Torres responded that he did.

Upon arrival at the home, the officers were met by Le's neighbor who reported that he had seen Le kneeling in the bathroom. Nelson and Torres proceeded inside. Both carried service weapons. Torres also carried a shield. Nelson was equipped with pepper spray and a Taser stun gun.

The officers announced their presence as police and then moved upstairs.

---

[1] Although the parties' characterizations often differ, the Court finds the following facts to be undisputed, except where otherwise noted. Facts asserted by the parties that are not mentioned here were either irrelevant or unnecessary to resolve the pending motion.

[2] To avoid confusion with the decedent, the Court refers to Amy Thu Bich Le by her first name.

1   Finding nothing in the larger rooms, they turned to a closed bathroom door located
2   off of a narrow hallway leading into a bedroom.  Officer John Mougier joined them
3   in the hallway.

4   Torres found the shield cumbersome, and at some point, he set it aside.  He
5   called out to the bathroom's occupant.  There was no verbal response.  Nelson
6   partially opened the door and then shifted to the opposite side of the doorway to peer
7   inside, his gun pointed toward the bathroom.  The bedroom was to his rear. Torres
8   and Mougier stood on the other side of the bathroom doorway.  Mougier had drawn
9   a Taser.

10  Nelson claims that he saw Le standing approximately four feet in front of him,
11  bent at the waist, hands on the bathroom counter.  Le looked at him over his left
12  shoulder with a "blank, unfocused, or 'thousand yard' stare."  (Nelson Decl. ¶ 8.)
13  There was blood on his neck and shirt and "what appeared to be a cut to his neck."
14  (Nelson Decl. ¶ 8.)  Nelson initially thought he saw a knife on the counter but then
15  realized it was scissors.

16  Nelson gave Le several firm orders in quick succession: "Get your hands
17  away from the knife. Your hands away from the knife.  Push it on the floor.  Push
18  that on the floor.  Push it on the floor.  It's the police department.  No, no, put it
19  down.  Put it down.  Drop the scissors.  Drop the scissors.  We just want to help you.
20  Don't come out here.  Don't come out."  Nelson then fired a single shot.  The bullet
21  hit Le near the left eye and perforated his brain stem.

22  Nelson spoke to Le for no more than twenty-five seconds before firing the
23  fatal shot.  The video camera is trained on Nelson throughout.  The interior of the
24  bathroom (and thus Le) is not visible.

25  The parties offer different characterizations of how Le responded to Nelson's
26  commands.  Defendants rely on Nelson's declaration that Le picked up the scissors,
27  turned to square his body with the bathroom door and "began to raise the scissors in
28  a stabbing motion with the blades facing down."  (Nelson Decl. ¶ 12).  They also

submit testimony from a deputy medical examiner that Le was close to the threshold of the doorway facing out toward the hallway when the bullet struck him. (Schaber Depo. 48:25-49:8). Plaintiffs contend that Le did not step, lunge or otherwise move toward Nelson.

## II. Procedural background

Amy and Le's adult children filed suit on September 27, 2011.[3] They allege six claims. The first two are civil rights claims for relief pursuant to 42 U.S.C. § 1983: (1) a Fourth and Fourteenth Amendment claim against Nelson; and (2) a *Monell* claim against the City of Escondido and its chief of police. The remaining claims, asserted against all defendants, are based on state law. They are: (3) violation of California Civil Code § 52.1; (4) negligence; (5) assault and battery; and (6) violation of California Civil Code § 51.7.

Defendants moved for summary judgment in October 2012. ECF No. 22. Plaintiffs filed an Opposition but stipulated to the dismissal of the second, third, fifth, and sixth claims for relief. ECF No. 25. Defendants filed a Reply. ECF No. 27. The Court took the matter under submission and now resolves the motion pursuant to Civil Local Rule 7.1.d.1.

## LEGAL STANDARD

"Summary judgment is appropriate only 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Stoot v. City of Everett*, 582 F.3d 910, 918 (9th Cir. 2009) (quoting FED. R. CIV. P. 56(c)). The Court must deny summary judgment if, "viewing the evidence in the light most favorable to the non-moving party," there is a genuine dispute as to a material fact. *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002). "Only disputes over facts that might affect the outcome of the suit under the governing law

---

[3] Amy Thu Bich Le sues in her individual capacity and as Le's successor in interest. Kevin Le and Vivian Le sue as individuals. Police Chief Jim Maher is sued in both his individual and official capacities. Nelson is sued in his individual capacity.

1  will properly preclude the entry of summary judgment. Factual disputes that are
2  irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477
3  U.S. 242, 248 (1986). The non-moving party cannot avoid summary judgment by
4  producing a mere "scintilla of evidence." *Id.* at 252. "[T]here must be evidence on
5  which the jury could reasonably find for the plaintiff." *Id.* Further, the court need
6  not accept that party's version of the facts when it is "utterly discredited" by video
7  evidence. *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell
8  two different stories, one of which is blatantly contradicted by the record, so that no
9  reasonable jury could believe it, a court should not adopt that version of the facts for
10 purposes of ruling on a motion for summary judgment.")

## DISCUSSION

The only remaining claims for relief are the § 1983 claim against Nelson and the state law claim for negligence against all defendants. Plaintiffs' § 1983 claim encompasses violations of two distinct rights. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994) ("Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." (citation and internal quotation marks omitted)). First, Plaintiffs assert a Fourth Amendment excessive force claim on Le's behalf.[4] Second, Plaintiffs assert a Fourteenth Amendment substantive due process claim for loss of familial relations.[5] The Court

---

[4] As Le's alleged successor in interest, Amy has standing to pursue the Fourth Amendment claim. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998) ("[T]he survivors of an individual killed as a result of an officer's excessive use of force may assert a Fourth Amendment claim on that individual's behalf if the relevant state's law authorizes a survival action."); CAL. CODE CIV. P. § 377.30 ("A cause of action that survives the death of the person entitled to commence an action or proceeding passes to the decedent's successor in interest . . . and an action may be commenced by the decedent's personal representative or, if none, by the decedent's successor in interest.).

[5] Le's children, at least, may assert a Fourteenth Amendment claim. *See Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) ("The Ninth Circuit recognizes that a parent has a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of his or her child . . . and that a child's interest in her relationship with a parent is sufficiently weighty by itself to constitute a cognizable liberty interest." (citations and internal quotations marks omitted)). Whether Amy can assert a similar claim is unclear. *Compare Engebreston v. Mahoney*, No. CV 09-98-M-DWM-JCL, 2010 U.S. Dist. LEXIS 36176, at *14 (D. Mont. Mar. 3., 2010)

will address each claim separately.⁶

## I. Fourth Amendment

Plaintiffs may not assert a Fourth Amendment claim if Nelson is entitled to qualified immunity. "Qualified immunity shields an officer from suit when [he] makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [he] confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). Put differently, the doctrine operates, "to protect officers from the sometimes hazy border between excessive and acceptable force." *Saucier v. Katz*, 533 U.S. 194, 206 (2001) (citation and quotation marks omitted). The Supreme Court has repeatedly stressed "the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

The crux of the immunity analysis is whether the use of force was premised upon a reasonable belief that such force was lawful. *Deorle v. Rutherford*, 272 F.3d 1272, 1285 (9th Cir. 2001). This is a two-part inquiry. Courts ask: (1) whether a constitutional violation occurred; and (2) whether the constitutional right was clearly established at the time of the alleged misconduct. *Cameron v. Craig*, __F.3d__, 2013 WL 1607488, at *6 (9th Cir. April 16, 2013). "[I]f the answer to either is 'no,' then the officers cannot be held liable for damages." *Glenn v. Wash. Cnty.*, 673 F.3d 864, 870 (9th Cir. 2011).

---

("Generally, a plaintiff's claim seeking compensation for the loss of support, consortium, or companionship with his or her spouse does not rise to the level of a constitutionally protected substantive liberty interest, the deprivation of which may be redressed under § 1983." (citation and internal quotation marks omitted)); *with Trevino v. Lassen Mun. Util. Dist.*, No. CIV. S-07-2106 LKK/DAD, 2008 U.S. Dist. LEXIS 112271, at *13 (E.D. Cal. Apr. 9, 2008) ("The Ninth Circuit's characterization of the liberty interest present in the parent-child relationship resounds also in the marital relationship."). As the parties have not briefed this question, the Court will not resolve it here.

⁶ The Complaint also makes passing reference to the First Amendment, however, in their responses to interrogatories, Plaintiffs failed to identify the First Amendment as a basis for their constitutional claims. Defendants contend that Plaintiffs have effectively abandoned this argument, and Plaintiffs have not argued to the contrary. Accordingly, the Court deems any First Amendment claim abandoned.

### A. Constitutionality of the force employed

Plaintiffs claim that Nelson violated the Fourth Amendment by using excessive force. To prevail, they must show that Nelson's use of force was objectively unreasonable. *Scott*, 550 U.S. at 381 (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)).

Reasonableness is assessed in light of "the objective facts and circumstances that confronted the officer or officers." *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994) (citing *Graham*, 490 U.S. at 396). A court must balance the intrusion on Fourth Amendment rights against the government's need for that intrusion—all "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. Courts consider the totality of the circumstances, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Blanford v. Sacramento Cnty.*, 406 F.3d 1110, 1115 (9th Cir. 2005) (citing *Graham*, 490 U.S. at 396). The most important of these factors is the threat posed to officers and others. *Smith v. City of Hemet.*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc). Other considerations might include "the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn*, 673 F.3d at 872. To justify *deadly* force, "an objective belief that an imminent threat of death or serious physical harm is required." *Price v. Sery*, 513 F.3d 962, 969 (9th Cir. 2008).

Plaintiffs contends that genuine issues of fact regarding the threat posed by Le

as well as the officers' tactical choices in responding to suicidal subject preclude summary judgment. The Court disagrees.

### 1. *The threat presented*

On this much, at least, the parties agree: Nelson's firing of a handgun constituted "deadly force." *See City of Hemet*, 394 F.3d at 693 ("We define deadly force as force that creates a substantial risk of causing death or serious bodily injury."). The crux of the parties' dispute is whether Le posed enough of a threat to warrant that response. Nelson claims that Le looked at him, turned to square his body with the bathroom door, and "began to raise the scissors in a stabbing motion with the blades facing down." (Nelson Decl. ¶ 12).[7] On the video, it appears that the door, already partially open, opened further when Nelson was issuing his commands, which suggests movement inside.

Plaintiffs advance a different theory. They contend that Le "did not charge, lunge or even take a step" toward Nelson. (Oppo. at 12.) They claim that the "yelling of various commands confused VAN LE and as such it is unknown if he was actually attempting to comply with Officer Matthew Nelson's multiple commands by merely attempting to hand over the scissors." (Oppo. at 17.) For support, Plaintiffs rely on Nelson's testimony that he did not see Le's feet move (Nelson Depo. at 104:15-17) and post-shooting photographs of Le's body in the hallway (Pls.' Exh. A, ECF No. 25-5). Plaintiffs also claim that the deputy medical examiner's testimony that the bullet traveled through Le's head without upward or downward deviation supports their theory that Le was not "moving forward or lunging." (Oppo. at 17-18.)

None of Plaintiffs' evidence creates a triable issue. Nelson testified that Le "was turning as he raised the scissors over his right shoulder all in one movement

---

[7] In an earlier deposition, Nelson explained it this way: "Shortly after he stands he turns towards my direction. As the door opens, he raises the scissors up over his right shoulder and begins to move towards me at which point I fire one round." (Nelson Depo. 96:15-18.)

1  and he's got forward movement towards me.  So, it's a deliberate movement as I
2  recall and it's a forward movement." (Nelson Depo. at 106:24-25, 107:1-3.)  That
3  Nelson did not watch Le's feet move during this sequence does not render Le's
4  movement a disputed fact.  Indeed, at close range, it would have been odd for
5  Nelson to have his eyes trained on Le's feet, rather than on Le's face or the bladed
6  object in his hand.  *See Burgess v. Liles*, No. C 08-4029 SI, 2011 U.S. Dist. LEXIS
7  2404, at *6, 16 (N.D. Cal. Jan 10, 2011) (rejecting the plaintiff's argument that an
8  officer's inability to see the decedent's feet at the moment he fired was inconsistent
9  with that officer's claim that the decedent took "half a step to one step" toward him).

10  Plaintiffs' photographs also are unavailing.  Plaintiffs propose that the
11  position of Le's body, particularly the angle of his feet, supports an inference he was
12  not facing Nelson when he was shot.  The Court is not persuaded.  Even assuming
13  that Le's body had not been moved before the photographs were taken (a possibility
14  Plaintiffs fail to address), nothing, beyond mere speculation, supports the inference
15  that Plaintiffs ask the Court to draw from these photographs.  Notably, their
16  interpretation is in direct conflict with the testimony of the deputy medical examiner
17  who concluded that Le was facing out toward the hallway when he was shot.
18  (Schaber Depo. at 48:25-49:8).  The Court need only draw reasonable inferences in
19  Plaintiffs favor.  Plaintiffs have not shown that their theory is reasonable.

20  Finally, Plaintiffs assert that if Le was moving forward, he would have
21  lowered his head, and the bullet would not have traveled straight through his head
22  from the entry point near his left eye.  The deputy medical examiner did testify that
23  the bullet path had minimal horizontal and vertical deviation ( Depo. at 39:4), but
24  Plaintiffs provide no support for their interpretation of that evidence, which is
25  refuted by Nelson's testimony that Le advanced with his head "in a forward facing
26  position" (Nelson Depo. at 107:23-25.)  Accordingly, the Court rejects it.

27  The Court is mindful that that the government's interest in using deadly force
28  is diminished when officers are confronted, not with a person who has committed a

serious crime against others, but with a mentally ill individual. *See Deorle*, 272 F.3d at 1283. But "there is no per se rule requiring mentally disabled persons to be treated differently from 'serious criminals.'" *Blanford v. Sacramento Cnty.*, 406 F.3d at 1117. In *Blanford*, deputies shot and severely injured a mentally ill man who ignored commands to stop and drop a sword that he was carrying and instead tried to enter a home in a residential area. *Id.* at 1112. The Ninth Circuit found the shooting reasonable because the deputies had cause to believe that the man posed "a serious danger to themselves and to anyone in the house or yard he was intent upon accessing, because he failed to heed warnings or commands and was armed with an edged weapon that he refused to put down." *Id.* at 1116. Here, Le was also non-compliant. Rather than move away from the scissors, Le picked them up and turned in the officer's direction. Le had already demonstrated the capability of the scissors to inflict lethal injury—the cut to his neck was nearly one inch deep and his shirt was covered in "abundant blood." (Schaber Depo. 23:15-16, 29:1-10, 65:21-22.) Under the circumstances, it was reasonable for Nelson to perceive an imminent threat of serious bodily harm. *See Patterson v. City of Toledo*, No. 3:10-CV-2547, 2012 U.S. Dist. LEXIS 58296, at *11 (N.D. Ohio Apr. 26, 2012) (finding the use of deadly force objectively reasonable when a police officer was faced with non-compliant and mentally ill individual, armed with scissors, advancing upon her in a small and constricted space.)

### 2. *The warnings issued*

Plaintiffs also suggest that Nelson's failure to issue a warning before using deadly force rendered his conduct unreasonable. (Oppo. at 22.) The Court disagrees. In *Deorle*, the Ninth Circuit held that "warnings should be given, when feasible, if the use of force may result in serious injury,"[8] and the failure to do so

---

[8] The City of Escondido's use of force policy includes a similar requirement. It states: "Officers must provide verbal warning prior to deploying any deadly or non-deadly force upon any person. The warning is required when feasible and must be sufficient to alert the person that force is

may be factored in to the reasonableness inquiry. 272 F.3d at 1283-84. But *Deorle* is distinguishable. In *Deorle*, a police officer shot a man with a less-lethal beanbag gun when he passed an "unannounced, pre-determined spot" selected by the officer who had not issued a warning. *Id.* at 1284. Here, Nelson pointed his gun toward the bathroom at close range while clearly and repeatedly ordering Le to move his hands away from the knife/scissors, to put the implement on the floor, and finally, to stay in the bathroom. By his words and actions, the message was clear: stop or I'll shoot. Nelson may not have said so expressly, but under the circumstances, his statements hardly required the added clarity.

### *3.   The tactics utilized*

Finally, Plaintiffs contend that deadly force would not have been necessary absent the officers' tactical mistakes. They contend that the officers should have developed a plan before entering the home (Oppo. at 17), and once upstairs, Nelson "had sufficient time and space to create a plan to deploy less lethal means" (Oppo. at 12).

In support, Plaintiffs rely on the declaration of their expert, Roger Clark, a veteran of the Los Angeles Sheriff's Department. The thrust of Clark's declaration is that the officers, upon arriving at Le's home, "should have stood by and waited for the sergeant to arrive to properly command the incident." (Clark Decl. at 4-5.) Clark opines that not doing so was "fatal error" because the officers' aggressive approach "obviously confused Van Le and more likely than not caused him not to comply with Officer Nelson's commands and caused the unjustified use of force." (*Id.* at 5-6.)

Such evidence fails to raise a genuine issue of material fact. As an initial matter, Clark's declaration is aimed not at the reasonableness of the force employed but at the officers' tactical choices before the shooting. It is well-established that a

---

about to be used." (Defs.' NOL, Exh. 10) (emphasis in original).

plaintiff cannot defeat summary judgment "by simply producing an expert report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless." *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002); *see also Reynolds v. Cnty. of San Diego*, 84 F.3d 1162, 1170 (9th Cir. 1996) (affirming summary judgment for a police officer despite expert testimony that the officer should have used approached a knife-wielding man in a different manner). That an expert may disagree with Nelson's actions "does not render the officer's actions unreasonable." *Reynolds*, 84 F.3d at 1170.

In hindsight, perhaps the officers should have pulled back, waited for a sergeant, and then developed a plan of action, but courts do not engage in a reasonableness analysis from that vantage point. By the time the officers arrived at the home, they knew that a man had possibly cut his throat. A neighbor told them Le was upstairs kneeling on the floor. The officers had good reason to believe a man's life was in danger. They did not know if he was still alive or would bleed to death in five minutes. Delay posed its own risk of tragic consequences. As the medical examiner testified, Le "probably" would have bled to death in less than an hour. Further delay posed a different risk of liability for the officers and an unnecessary risk to Le. In light of the objective facts and circumstances that confronted the officers at that moment—the presence of a potentially dangerous but potentially dying man upstairs—the Court cannot find that the officers' decision to enter the home immediately tainted any subsequent use of force.

Finally, although the availability of less-intrusive options may, in some cases, militate against a finding of reasonable force, officers are not required to use the *least* intrusive alternative. See *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). "Imposing such a requirement would inevitably induce tentativeness by officers, and thus deter police from protecting the public and themselves." *Id*. Nelson testified that there was not enough time to deploy pepper spray or another non-lethal option given the close confines of the hallway. (Nelson Depo. 119:15-25, 120:1-20.)

Indeed, the video shows that just two seconds elapsed from Nelson's warning—"don't come out here"—to the fatal shot. Under the circumstances, Nelson's decision to fire was within the range of conduct that courts identify as reasonable.

### 4. *Conclusion*

Even viewing the facts in the light most favorable to Plaintiffs, the Court finds Nelson's use of force reasonable under the circumstances. When Nelson confronted Le, there was four feet between them. A bedroom to Nelson's rear limited any potential retreat. Le, having cut his own throat, had already demonstrated the scissors' potential lethality. (Schaber Depo. at 28:4-6, 65:17.) Further, Le did not verbally respond to Nelson's directions. Instead, he turned toward the officer and raised the scissors. Nelson claims that he feared for his life. By responding the way he did, Nelson acted within the bounds of constitutionally acceptable behavior.

### B. **Clearly established law**

Even if the Court is wrong, Nelson would be protected by qualified immunity. Plaintiffs, borrowing (but slightly modifying) language from *Deorle*, state that "[e]very police officer should know that it is objectively unreasonable to shoot an injured man who: has committed no serious offense, is mentally or emotionally disturbed, has been given no warning of the imminent use of deadly force, poses no risk of flight, and presents no objectively reasonable threat to the safety of the officer or other individuals." (Oppo. at 22.) Notably, the original quotation included the descriptor "unarmed," which Plaintiffs replace with "injured." The substitution is telling. The record before the Court shows that Le was, in fact, armed. It is not accurate to say that he presented no objectively reasonable threat.

In 2005, the Ninth Circuit stated *en banc* that "where a suspect threatens an officer with a weapon such as a gun or knife, the officer is justified in using deadly force." *City of Hemet*, 394 F.3d at 704. Indeed, several courts have concluded that lethal force was reasonable when a suspect threatened an officer or others with a

bladed object. *See, e.g.*, *Reynolds*, 84 F.3d at 1168; *Blanford*, 406 F.3d at 1119 (deadly force was reasonable to stop a sword-wielding man who ignored officers' commands and attempted to enter a private residence). At the very least, those cases muddy the water. The Court cannot find that a reasonable officer in Nelson's position would have known that his conduct was unconstitutional. As a result, Nelson is entitled to qualified immunity.

## II.   Fourteenth Amendment

Plaintiffs' substantive due process claim fares no better. A Fourteenth Amendment claim is held to an even more stringent standard than a Fourth Amendment claim. To prevail, Plaintiffs must show that the challenged use of force "shocks the conscience." *A.D. v. Calif. Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013) (quoting *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). The type of behavior that shocks the conscience depends on the circumstances. Where actual deliberation is practical, conscience-shocking behavior is that which is taken with "deliberate indifference." *Id.* But where "an officer cannot practically deliberate, such as where 'a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives.'" *Id.* (quoting *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). "Legitimate" objectives include arrest, self-defense, or the defense of others. *Id.* at 454. Illegitimate objectives include bullying a suspect or getting even. *Id.* at 453.

The "purpose to harm" standard applies in this case. Officer Nelson responded to a radio dispatch about a man who had cut his own throat, a situation calling for fast action. The entire encounter, from the officers' arrival to the pull of the trigger, lasted but a few minutes. Deliberation was not practical under these circumstances. *See Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 836 (1998) (applying the "purpose to harm" standard where a police officer engaged in a high speed automobile chase); *Porter*, 546 F.3d at 1137 (applying the "purpose to harm"

standard where a police officer killed a suspect in a rapidly escalating confrontation).

Plaintiffs do not dispute that the "purpose to harm" standard applies (Oppo. at 23), but they fail to introduce any evidence that Nelson fired for a reason other than self-defense. The thrust of their argument appears to be that the police employed improper tactics, and that Nelson was tired and panicked. Even if true, that would not support a substantive due process claim—Plaintiffs must show bad intent. *See Cnty. of Sacramento,* 523 U.S. at 853 ("[W]hen unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates 'the large concerns of the governors and the governed.'" (quoting *Daniels v. Williams*, 474 U.S. 327, 332 (1986)). Plaintiffs' conclusory statement that there was "no need" to shoot Van Le does not save the claim.

In sum, Plaintiffs have failed to put forward evidence that Nelson had a purpose to harm for reasons unrelated to a legitimate law enforcement objective. Because they have not established a violation of the Fourteenth Amendment, Nelson is entitled to qualified immunity.

**III. Negligence**

Defendants next move for summary judgment on the negligence claim. All Defendants claim immunity on the grounds that the shooting was "justifiable homicide" as defined by the California Penal Code.[9] In addition, the City of Escondido asserts that there is no statutory basis for a direct negligence claim against it.

Plaintiffs do not address either issue directly. They state that police officers can be held liable for "negligent shooting," and the City may be vicariously liable

---

[9] Penal Code ¶ 196 provides, in part: "Homicide is justifiable when committed by public officers . . . [w]hen necessarily committed in overcoming actual resistance to the execution of some legal process, or in the discharge of any other legal duty." Penal Code § 197, which applies to private citizens, is the analogue of § 196. *Gilmore v. Superior Court*, 230 Cal. App. 3d 416, 421 (1991).

for such conduct. Plaintiffs' negligence claim, in other words, now appears to be premised entirely on the conduct of the officers on scene.[10]

In the Court's view, the shooting of Le was justifiable under the Penal Code standard. "The test for determining whether a homicide was justifiable under Penal Code section 196 is whether the circumstances reasonably create[d] a fear of death or serious bodily harm to the officer or to another." *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 533 (2009) (citation and internal quotation marks omitted). As explained above, such circumstances were present. Because justifiable homicide is a privileged act, Nelson is not subject to tort liability arising from it. *See Brown*, 171 Cal. App. 4th at 533; *Gilmore v. Superior Court*, 230 Cal. App. 3d 416, 420 (1991) ("Indeed, the Penal Code's characterization of certain acts, otherwise unlawful, as 'justifiable' is simply the application of a common law label to conduct modernly described as privileged.") Moreover, a "public entity is not liable for an injury resulting from an act or omission of an employee . . . where the employee is immune from liability." CAL. GOV'T CODE § 815.2(b). Thus, there is no basis for the City's vicarious liability.

Lastly, the City is correct that Plaintiffs have failed to identify a statutory basis for any claim of *direct* negligence. In California, "direct tort liability of public entities must be based on a specific statute declaring them to be liable, or at least creating some specific duty of care[.]" *Munoz v. City of Union City*, 120 Cal App. 4th 1077, 1112 (2004). In their opposition, Plaintiffs only identify a basis for indirect liability—California Government Code § 815.2(a).[11] Thus, even if Nelson's

---

[10] Chief Maher no longer appears to be a target of the negligence claim. *See* (Oppo. at 24 ("Plaintiffs have also brought a damages claim based on a theory of negligence against Officer Matthew Nelson and City of Escondido.")) Because Plaintiffs do not respond to Defendants' motion insofar as it applies to Chief Maher, the Court grants summary judgment in the chief's favor.

[11] California Government Code § 815.2(a) provides: "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative."

shooting was not "justifiable," Plaintiffs have failed to assert a claim of direct negligence against the City. For those reasons, the Court grants summary judgment for Defendants.

## CONCLUSION

Having examined the evidence in the record, the Court cannot find a triable issue. Defendants' motion for summary judgment is **GRANTED.** The clerk may close the case.

**IT IS SO ORDERED**

DATED: May 6, 2013

Hon. Roger T. Benitez
United States District Judge